KANSAS CITY HAY–PRESS CO. v. DEVOL et al.

(Circuit Court, W. D. Missouri, W. D. March 12, 1896.)

No. 1,987.

1. CORPORATIONS—POWERS OF OFFICERS—CONVEYANCE OF PROPERTY.
The M. Co. owned a patent under which all its business was done, and which constituted practically all its capital. A suit was pending against the M. Co., brought by the K. Co., for infringement of a patent owned by the latter. Pending this litigation, C., the president of the M. Co., being about to abscond, to avoid prosecution for certain criminal acts of which he had been guilty, was induced, in order to pay a debt to one K., and to pay the fees due to the lawyers of the M. Co., to make an arrangement with K. and the K. Co. by which, acting as president of the M. Co., he assigned the patent owned by that company to K., in consideration of the discharge of his debt to K. and the payment of the lawyers' fees; it being also agreed that K. should assign the patent to the K. Co., which thereby put an end to its infringement litigation. No part of the consideration passed to the M. Co., which was left with considerable debts outstanding, and substantially without assets. No meeting of the directors of the M. Co. was held to consider or authorize the transaction, and one of the three directors was not informed of it; the third, besides C., the president, at first objecting to it, but finally assenting, when urged by C. and the company's lawyers. The statute under which the M. Co. was organized provided that its property and business should be managed by directors, and that the decisions of the directors, duly assembled as a board, should be valid. The by-laws provided that the directors, and the president, under their control, should have the general management of the affairs of the corporation, and that the president should execute and acknowledge instruments requiring acknowledgment, provided that he should not execute any instrument by which real estate was conveyed or stock controlled until authorized by the board of directors. *Held,* that the execution of the assignment of the patent by C., as president of the M. Co., was without authority, and such assignment was ineffectual to pass title to K., or through him to the K. Co., both having knowledge of the circumstances, and, hence, that the K. Co. had no title to the patent which would enable it to maintain a suit for its infringement.

2. SAME.
In such action, where the complainant declares alone on the existence of a legal title to the patent sued on, it cannot avail him at the trial, after failing to show such legal title, that he held a contract with one of the defendants whereby it was agreed, for a consideration, that such defendant would transfer to complainant any invention he might thereafter have patented, such invention being interposed to defeat complainant's claim.

This was a suit by the Kansas City Hay-Press Company against H. F. Devol, George Devol, and W. S. Livengood, to restrain the infringement of a patent. The cause was heard on the pleadings and proofs.

R. H. Manning, Scammon, Crosby & Stubemauch, and Offield, Towle & Linthicum, for complainant.

Geo. A. Neal and T. S. Brown, for respondents.

PHILIPS, District Judge. This is a bill in equity to enjoin the respondents from infringing on certain patent rights claimed by the complainant. The claim is what is known as a "combination claim," based on several patents claimed by the complainant. Among these is patent No. 495,944 (serial No. 439,907), dated April 18, 1893, granted to Winfield S. Livengood (one of the respondents), Walter H. Chadbourne, and James M. Gibbons, of Kansas City, Mo. It is conceded by the parties that this patent passed by assignment and vested in the Midland Manufacturing Company of Kansas City, a corporation created under the general corporation laws of the state of Missouri. The complainant claims thereunder by mesne assignments. This title is sharply controverted by the respondents. As the ownership of this title by the complainant is essential to the right of recovery, the question raised lies at the threshold of this controversy. The instrument under and through which complainant claims is as follows:

"Whereas, Winfield S. Livengood, Walter H. Chadbourne, and James M. Gibbons, all of Kansas City, in the state of Missouri, invented certain new and useful improvements in baling presses, for which, on the 15th day of July, 1892, they filed application for letters patent of the United States, serial number 439,907, all of which said parties having assigned their entire interest in said improvements to the Midland Manufacturing Company, of the same place; and whereas, Edward Kelly, of the same place, is desirous of acquiring the entire interest in said invention, and in the letters patent to be obtained therefor: Now, therefore, to all whom it may concern, be it known that for and in consideration of the sum of eight hundred ($800) dollars, to it in hand paid, the receipt of which is hereby acknowledged, the said Midland Manufacturing Company, through its duly-authorized president, Walter H. Chadbourne, have sold, assigned, transferred, and by these presents do sell, assign, and transfer, unto the said Edward Kelly, the full and exclusive right to the said invention, as fully set forth and described in the specification executed by the said Livengood, Chadbourne, and Gibbons preparatory to obtaining letters patent of the United States therefor. And the said Midland Manufacturing Company does hereby authorize and request the commissioner of patents to issue the said letters patent to the said Edward Kelly. as the owner of the entire right, title, and interest in and to the same, for the sole use and behoof of the said owner and his legal representatives. In testimony whereof, I have hereunto set my hand and affixed, the corporate seal of said company, this 23rd day of March, A. D. 1893.

"The Midland Manufacturing Company,

"[Seal.]                                    By W. H. Chadbourne, Prest.

"Attest:  P. D. Myers, Secy."

Did Chadbourne, who signed this instrument as president, have authority to execute the same and pass the title? The statute under which this company was incorporated provides (Rev. St. Mo. 1889, § 2772) that "the property or business of the corporation shall be controlled and managed by directors, not less than three nor more than thirteen in number." Section 2508 provides, inter alia, that such corporation has power "to make by-laws not inconsistent with existing law, for the management of its property, the regulation of its affairs and for the transfer of its stock." Among the by-laws adopted by this company are the following:

"Art. 4. An annual meeting of the directors shall be held immediately after the annual stockholders' meeting, on the second Monday in January, at the general office of the company. Special meetings of the board may be held at any time, on written call of the president, mailed by registered letter to the usual place of address of each director five days prior to said meeting. The board of directors shall have the general management and control of the affairs of the company, being the trustees holding and managing the corporation property for the benefit of the stockholders." "Art. 6. It shall be the duty of the president to preside at all meetings, both for directors and stockholders; to issue calls for special meetings of the board of directors, and perform such duties as the board of directors may prescribe. The president shall, under the directors, have the general management and control of the business affairs of the company. The president, treasurer, and secretary shall attest the same, and affix the corporate seal thereto. The president shall execute and acknowledge, in behalf of the company, all instruments requiring acknowledgment: provided, that in no case shall he execute and acknowledge any instrument of writing whereby real estate is conveyed or affected, or stock is to be controlled, until he has been authorized by the board of directors."

At its inception, on June 18, 1892, the directors named were said Chadbourne, Livengood, and Gibbons; said Chadbourne being named as the president, and Livengood as the secretary. On August 1, 1892, at a stockholders' meeting, it was voted to increase the number of directors to five, which was done by naming James Trowbridge and John Wedge additional directors. But as no certificate evidencing this increase of directors was filed with the secretary of state, as prescribed by said section 2508 of the statute, that act, for the purposes of this case, may be regarded as ineffectual, thus leaving the board of directors as originally constituted. At said meeting on August 1, 1892, Livengood tendered his resignation as secretary of the board, which was accepted, and thereupon P. D. Myers was elected director and secretary. It does not affirmatively appear that Livengood ever resigned as director, though the board seems to have acted on that assumption. The last meeting of the board, as shown by the records of the company, was held August 15, 1892, at which nothing was done.

It may be conceded that, where a deed in form is made by the officer authorized by statute to make it, it is prima facie evidence of a conveyance; but it is subject to explanation and contradiction by evidence, and will be ineffectual to pass the title to one taking with knowledge of the facts contradicting the authority. The facts, as disclosed by this record, are that this same complainant, at the time of said attempted assignment and conveyance, had pending in this court a suit against said Midland Manufacturing Company for infringement of complainant's rights under its other patents. Pending that litigation said Chadbourne got into some trouble, criminal in its character, which, in his judgment, rendered an indefinite leave of absence from the state advisable. He owed one Edward Kelly between two and three hundred dollars. To pay that and the lawyers who represented the manufacturing company in said litigation, Chadbourne was induced, before leaving, to execute said instrument to Kelly, who was then to convey to complainant company. The said arrangement in fact was made to accomplish a threefold object: First, to enable Kelly to collect

his claim against Chadbourne; second, to enable said lawyers to get their fees; and, third, to obtain this money the complainant company was brought into the scheme, its inducement being to get rid of that litigation, and to acquire whatever of right and value there was in the patent. Whether any part of the money thus obtained went to aid Chadbourne in his flight, does not affirmatively appear. There is an entire absence of proof that one dollar of this purchase money went into the treasury of the manufacturing company, and its debts, of a large amount, were left unsatisfied. There was no meeting of the board of directors to consider this attempted sale, although they had, at the regular meeting in August preceding, established an office and place of meeting. The matter of such sale and transfer was never considered nor canvassed by the board of directors, as such, and one of the directors (Gibbons) was not even notified thereof. Chadbourne was simply called into the private office of said lawyers, and his signature to the instrument of conveyance was there obtained. Mr. Myers, in his testimony, explains this transaction. He says that they met Mr. Sooy, the president of the complainant company, and made to him a proposition to buy out the whole concern on condition that Mr. Livengood was to manufacture hay presses for the complainant, and he (Sooy) was to assume and pay the debts of the Midland Manufacturing Company. This being declined, it was finally concluded, as far as Sooy and the attorneys of the manufacturing company were concerned, to turn the property over to Kelly, for money he had loaned Chadbourne, and for some checks which he had loaned to the company, and for the fee that said lawyers claimed for conducting said suit,—all at an estimate of about $800. Myers testified:

"After their plans were submitted to me, and the assignment paper made out for my signature as secretary of the company, I refused to do it, on the ground, as I had then learned, that these patents were about the entire capital stock of the company, and without the action of the board of directors, and others interested, they had no right to do it."

He says there was no meeting of the board of directors to consider the matter.

"I told Mr. Alderson [one of the lawyers] I would not do it, and I told Mr. Chadbourne and I told Mr. Kelly that I would not do it; but Alderson was the attorney of the concern, and insisted that I had a right to do it, and he and Chadbourne overruled me, and I did do it. I always insisted that whoever took the patents should pay the debts of the company."

All he did was simply to "attest" the instrument. Mr. Gibbons, the other director, was not even notified of this action.

It is common learning, universally recognized in this country, that such corporations are precisely what the act of their creation makes them,—no more and no less. They possess such faculties only as they are endowed with by the creative act. As said by Wagner, J., in City of St. Joseph v. Clemens, 43 Mo. 404:

"The corporate acts must not only be authorized by the charter, but these acts must be done by such officers and agents, and in such manner, as the charter directs."

Officers of corporations are special, not general, agents. They have no power to bind the corporation, except within the limits prescribed by the charter and by-laws, and persons dealing with them are charged with notice of the extent of their authority. Adriance v. Roome, 52 Barb. 399. The designation of certain methods and agencies by the charter implies a prohibition of any others. Landers v. Church of Rochester, 97 N. Y. 119. Parties dealing with such corporations take with notice of the by-laws. Dabney v. Stevens, 32 N. Y. Super. Ct. 415, 46 N. Y. 681. So it is held that, where the officers of a corporation execute assignments of its property without authority, it cannot be made good by any proof of execution before a commissioner. Murray v. Vanderbilt, 39 Barb. 140.

What is the direction of the charter of this company? Section 2510, Rev. St. Mo. 1889, provides that:

"When the corporate powers of any corporation are directed by its charter, or the provisions of this law, to be exercised by any particular body or number of persons, a majority of such body or persons, if it be not otherwise provided in the charter or law creating it, shall be a sufficient number to form a board for the transaction of business, and every decision of a majority of the persons duly assembled as a board shall be valid as a corporate act."

This statute does not say that an act shall be deemed to be that of the governing board whenever it shall be shown to have received the sanction of members of the board, but its express language is that this voice of the majority shall control in the corporate transactions, when "duly assembled as a board." How is this corporate action—the voice of the body politic—to be evidenced? Clearly, by assembling together as a board, either at regular, stated meeting, or at a called convention after due notice to each member of the board, as prescribed by the by-laws herein quoted.

The state of California has a similar statute. In Gashwiler v. Willis, 33 Cal. 12, the court held that not all the stockholders, concurring by separate acts or joint act, could transfer the corporate property, because—

"The property in question was the property of the artificial being created by the statute. The whole title was in the corporation. The stockholders were not, in their individual capacities, owners of the property, as tenants in common, joint tenants, copartners, or otherwise."

And although the governing board of trustees were present, and participated in the act of the stockholders, it was held to be ineffectual to pass the title. The court said:

"Such is not the mode in which the corporation is authorized by the law of its creation to manifest its will and exercise its corporate powers. The power to sell and convey could only be conferred by the trustees when assembled and acting as a board. This is the mode prescribed."

In McCullough v. Moss, 5 Denio, 567, the court says:

"The affairs of the corporation were to be conducted by five directors, a majority of whom formed a board for the transaction of business, and a decision of a majority of those duly assembled as a board was requisite to make a valid corporate act. * * * When a charter invests a board with power to manage the concerns of a corporation, the power is exclusive in its character. * * * The stockholders, as such, in their collective capacity,

could do no corporate act. The directors were their representatives, and alone authorized to act."

In Cammeyer v. Lutheran Churches, 2 Sandf. Ch. 208–229, the vice chancellor said:

"The directors in the bank, and the trustees, in this case, are, by the charter, the select class or body which is to exercise the corporate functions. In order to exercise them, they must meet as a board, so that they may hear each other's views, deliberate, and then decide. Their separate action, individually, without consultation, although a majority in number should agree upon a certain act, would not be the act of the constituted body of men clothed with the corporate powers. Nor would their action in a meeting of the whole body of corporators, or of another and larger class, in which they are but a component part, be a valid corporate act. In thus acting they would not be distinguishable from their associates, and their action is united with that of others who have no proper or legal right to join with them in its exercise. All proper responsibility is lost. The result may be the same that it would have been if they had met separately, and it may be different. In the general assemblage, influences may be brought to bear upon the trustees, which, in their proper board, would be unheeded, and no one can say with certainty that their vote in the latter event would have been the same."

In State v. Ancker, 2 Rich. Law, 245, the court, speaking of the action of a board illegally assembled, says:

"Without being summoned together, the board, as individuals, have no official authority, nor have they any original authority at all, either under the charter or the by-laws."

So it is said in Titus v. Railroad Co., 37 N. J. Law, 102:

"The affairs of corporate bodies are within the exclusive control of their board of directors, from whom authority to dispose of assets must be derived."

See, also, Bank v. Dunn, 6 Pet. 51; U. S. v. City Bank of Columbus, 21 How. 356; Railway Co. v. Allerton, 18 Wall. 233; Walworth County Bank v. Farmers' Loan & Trust Co., 14 Wis. 357; Hyde v. Larkin, 35 Mo. App. 365.

Another question of gravity is presented by this action of the president of the Midland Manufacturing Company. It has been held by high authority that it is not within the contemplation of the legislative grant of such a franchise that the board of directors, even by their formal action, can deed away the entire property of the corporation, on which it depends for "living up to the object of its creation"; for, when they thus strip the corporation of its means of subsistence, they put an end to its active life, and work out its practical dissolution. This is not within the terms of their agency to "manage its business affairs." Abbot v. Rubber Co., 21 How. Prac. 193, 33 Barb. 578; 1 Mor. Priv. Corp. §§ 512, 513. It has been held in this state that directors of such corporations may make a deed of general assignment for the benefit of creditors, and the like, as such act, in case of insolvency, is but executing the intendment of the charter, in conducting its business, by thus applying the assets for the purpose for which the directors held them in trust; yet I undertake to say that no authority can be found to support the action of the president of this concern, attended with the remarkable circumstances which characterize the transaction under review. And while it is true that the charter

of this company, following more the letter of the statute than the spirit prompting the incorporators, authorized them to engage in other business operations, the concern in fact had no other business or property. It was organized by the three grantees under said patent, and for the purpose of manufacturing and selling hay presses thereunder. The patent gone from their control, the corporation ceased to be "a going concern." It is suggested in argument by counsel that these defendants are not in position, in this action, to interpose this defense. Why not? The bill counts on a naked legal title; as much so as an action of ejectment, or trespass vi et armis. Chief Justice Dixon, in Walworth County Bank v. Farmers' Loan & Trust Co., supra, met a like contention with characteristic aptness. After conceding that in the action of trespass, where possession of personal property was ordinarily sufficient to maintain trespass against all persons save the owner, he said:

"But when, in order to prove possession, it becomes necessary for the plaintiff to show a transfer of the property from some former owner to himself, and he attempts to do so, and fails, the right of action fails also."

And, looking at the equities of this case, the defendant Livengood, at least, who seems to have had about genius enough to invent something in mechanics, but not enough common sense to protect his discoveries against his immediate necessities, may well complain of this attempted transfer of the patent which is the claimed product of his mind. He owned $8,000 of the capital stock of this corporation. When he resigned his secretaryship, the concern contracted to pay him an amount of money for his stock, which stock was placed—in the nature of an escrow—with one Wedge, to hold until the purchase money was paid. That money was never paid, and consequently the stock, of right, belongs to Livengood. So, when Chadbourne undertook to convey the patent to the complainant company, had it been effective, it would have rendered absolutely valueless the claim of the defendant Livengood. He has a right, therefore, in this action, to complain of the attempt of Chadbourne to thus despoil him.

The complainant has presented in evidence an alleged contract with Livengood,—made in 1889, perhaps,—by which Livengood was to concede to complainant any future patents he might acquire. There are several answers to the interposition of this claim: No such issue is presented by the pleadings, and therefore the same cannot be considered. Newham v. Kenton, 79 Mo. 382. It was also an executory contract, for breach of which, if any, the complainant has a remedy in another form of action, the forum for which would be the state court, the parties being citizens of this state. It cannot be the predicate of a claim for the infringement of a patent of which the complainant is not the legal owner.

Inasmuch, therefore, as the lack of title to said patent No. 495,-944 breaks the continuity of the combination claim, it results, without considering the validity of complainant's other patents, that this action must fail. The bill is accordingly dismissed, at complainant's costs.