## WILSON v. COOPER et al.

### (Circuit Court, D. Nebraska. June 19, 1899.)

**1. CONTRACTS—CONSTRUCTION.**

When a written contract is entirely prepared by one of the parties, and accepted as thus prepared by the other, any doubt as to the meaning of provisions therein is to be resolved against the party preparing it.

**2. SAME—CONTRACT FOR BUILDING OF ICE PLANT—WARRANTY OF CAPACITY.**

Plaintiff contracted to build for defendant an ice-making plant in Lincoln, Neb., the contract containing the following provision: "We guaranty the consumption of coal not to exceed [four and a half] tons of good steam coal, when the machine and plant are properly operated, to produce the equivalent of [thirty] tons of ice manufactured every twenty-four hours of continuous operation, provided that the steam boilers evaporate eight pounds of water for every pound of coal burned." This warranty was on a printed form used by plaintiff generally, with blanks left for the portions in brackets, which were filled in writing. *Held*, that such blanks must be presumed to have been filled with reference to the plant contemplated by that particular contract and the kind of coal commonly used in Lincoln for steam purposes, and there considered good steam coal; and, as the contract required plaintiff to furnish the boilers, smokestack, and other appurtenances on which the amount of evaporation depended, the provision was a warranty that the plant, as constructed, with the coal so contemplated, would produce 30 tons of ice in each 24 hours of continuous operation, with a consumption of only 4½ tons of coal. To give full effect to the concluding proviso of the warranty would enable the plaintiff to render it nugatory in every case by so constructing the plant that the required evaporation could not be obtained.

This was an action on notes given in payment for the construction of an ice plant. The defense was a breach of warranty as to the capacity of the plant.

Lambertson & Hall, for complainant.

Charles O. Whedon, for defendants.

SHIRAS, District Judge. From the evidence in this case, it appears: That the Arctic Machine Manufacturing Company, a corporation created under the laws of the state of Ohio, with its principal place of business at the city of Cleveland, was engaged, in the year 1896, in the manufacture and erection of an apparatus or plant for the making of ice, under certain letters patent owned by the company. That in the early part of that year it entered into negotiations with P. H. Cooper, the defendant, for the furnishing and erection at Lincoln, Neb., of one of its plants. That in the conduct of these negotiations the Arctic Company was represented by one William Hargreaver, and the present complainant, Frank Wilson, who was then the secretary of the company. That these negotiations were wholly conducted and concluded at Lincoln, Neb., at which place the company's representatives, Hargreaver and Wilson, had spent some time pending the negotiations, and had, by personal observation, familiarized themselves with the surroundings, so that they had full opportunity to know the circumstances under which the plant they were proposing to furnish would be operated. That under date of April 23, 1896, the Arctic Company submitted to the defendant P. H. Cooper a proposition headed as follows: "We hereby propose to furnish you

95 F.—40

a thirty-tons (30-tons) ice-making plant, in accordance with the following specification, to consist of," etc. The specification includes steam cylinder, pumps, fly wheels, ammonia condenser, distilled-water apparatus, and the necessary connections, steam boilers, describing the size thereof, smokestack, and other like matters, and, after a full description of the article to be furnished, the specification continues:

"We will construct the said thirty-ton ice-making plant, in all of its parts, in a thorough and workmanlike manner, using none but the best materials, and, under the stipulated conditions, will guaranty that said plant will perform the work herein specified, and, if the machine and plant are properly handled, will guaranty that the compressor will not deteriorate in efficiency; and we will warrant and maintain the engine, compressor, piping, and tank in good working order, from one year from the date of their completion, and will replace any part of said machine or plant which may prove defective, either in material or workmanship, during the time of the guaranty, the usual wear and tear and damage caused by your negligence or carelessness, or that of your agents or workmen, excepted.

"Coal consumption: We guaranty the consumption of coal not to exceed 4½ tons of good steam coal, when the machine and plant are properly operated, to produce the equivalent of 30 tons of ice manufactured every twenty-four hours of continuous operation: provided, that the steam boilers evaporate eight pounds of water for every pound of coal burned."

On the same day, to wit, April 23, 1896, the parties named signed a contract in writing, wherein it was agreed:

"That said party of the first part hereby agrees to construct and deliver to the said party of the second part the hereinbefore specified thirty-tons ice-making apparatus, made under letters patent owned or controlled by the Arctic Machine Manufacturing Company, and in accordance with the annexed specification, for the sum of $24,780, to be paid by the party of the second part to the party of the first part, as follows."

Acting under this contract, of which the specification formed part, the Arctic Company undertook the erection of the plant at Lincoln, Neb., and on the 19th day of August, 1896, the defendant Cooper executed his several promissory notes for the purchase price, from which the sum of $1,500 was deducted as compensation for delay in completion of the contract on part of the Arctic Company, and the notes then executed were secured by mortgage on the realty upon which the ice plant had been erected, the mortgage being duly signed by P. H. Cooper and Sarah Cooper, his wife. Of the notes thus secured, there remain unpaid three in number, each for the sum of $5,926.66; one being payable October 1, 1897, one on October 1, 1898, and one on October 1, 1899. It further appears that in November, 1896, the Arctic Company becoming insolvent, the present complainant, Frank Wilson, was appointed receiver of the company by the court of common pleas of Cuyahoga county, Ohio, and in that capacity he has brought this suit to foreclose the mortgage executed by Cooper and wife, as above stated.

To this suit two defenses are interposed by the defendants; the first being that the notes coming due October 1, 1898 and 1899, have each been altered in a material particular since they were signed, by writing in on the face thereof the words "payable annually," thus making the interest payable each year instead of at the maturity of the note, it being averred that this alteration was made by the Arctic Company without the consent of the defendant P. H. Cooper, and that

these notes are thus rendered void and nonenforceable. It is shown in the evidence that under date of November 23, 1896, the treasurer of the Arctic Company, Martyn Bounell, in a postscript to a letter addressed to P. H. Cooper, stated:

"By an oversight, the three notes falling due in '97, '98, and '99, given us at the time settlement was made for the plant, do not state that the interest on same is payable annually, as provided in the contract. We will ask that you authorize us to insert these words on the face of the notes, viz. 'interest payable annually.' "

It does not appear that Cooper ever answered this letter. The officers of the Arctic Company testify that the notes are now just as they were when signed by Cooper, and that no alteration has been made therein. Cooper testifies that, when he signed the notes, the words "payable annually" were not included therein, and the clerk who drew up the notes and mortgage testifies that these words are not in his handwriting. Bounell, who wrote the letter already referred to, testifies that he must have been misled by the fact that the note coming due October 1, 1897, did not contain the words "payable annually," and hence assumed that the others were worded in like manner. The clerk (William Schulte) who drew up the notes testifies that he wrote the word "Date" in each note, but does not think the words following, "payable annually," are in his handwriting; but a careful inspection of these words, and comparison of the notes with the others executed at the same time, satisfies me that the words "payable annually" were written by the same hand and at the same time that the word "Date," preceding them, was written, and, as it is not questioned that this word was written by the clerk before the notes were signed, it follows that this defense of alteration of the notes is not made out.

The remaining defense is that the plant furnished by the Arctic Company did not comply with the guaranty contained in the contract of the parties, in that it requires much more than $4\frac{1}{2}$ tons of coal to produce 30 tons of ice for each 24 hours of continuous operation, and thus the question arises as to the construction to be placed on the contract of the parties in this regard. On part of the complainant it is claimed that the Arctic Company only guarantied that the machine would produce 30 tons of ice in 24 hours, with an expenditure of $4\frac{1}{2}$ tons of coal, in case the boilers would evaporate eight pounds of water for every pound of coal burned, but that there was no obligation on the company to furnish boilers which would evaporate eight pounds of water for every pound of such coal as was in common use at Lincoln; that the size and style of boiler to be furnished was expressly named in the specification attached to the contract, and hence no implied warranty can be imposed upon the company with regard to the evaporating powers of the boilers. Thus, in the brief filed by counsel for complainant, it is said: "What did the parties have in mind when they signed and delivered the Cooper contract? As above stated, the fact that this contract was on a printed form, for use generally, may be regarded as evidence conclusive that, so far as the Arctic Company was concerned, it did not contract with reference to steam coal in general use in Lincoln, Neb. It would be very unreasonable to

hold that the Arctic Company intended by this printed clause, with reference to coal consumption, to contract one thing at Lincoln, Neb., where one grade of coal is used, another thing at Pittsburg, Pa., where another grade of coal is used, and a third thing at Cuba, where another grade is used. The latter part of the coal-consumption guaranty clause makes what precedes it entirely clear. The steam coal, under which and conditional on which the Arctic Company had made this guaranty, must be such that the steam boilers will evaporate eight pounds of water to each pound of coal. With that clause in, this same form of contract can be used in any place; and the local party, Mr. Cooper, in Lincoln, Neb., John Smith, in Pittsburg, or some other man in Cuba, knowing the evaporating power of the coal he proposes to use, can compute the number of tons he will require."

The evidence clearly shows it to be the fact, as it is stated to be by counsel for complainant, that the contract for the erection of the ice plant was wholly prepared by the company, being in printed form, with certain blanks left therein, which were filled up in writing by the agents of the company. It is therefore a case for the application of the general rule that, where one party prepares the contract and the other accepts it as thus prepared, if there is doubt as to the construction of any of the clauses therein contained, the interpretation must be against the party who prepared the contract. Noonan v. Bradley, 9 Wall. 394; Thompson v. Insurance Co., 136 U. S. 287, 10 Sup. Ct. 1019; Imperial Fire Ins. Co. v. Coos Co., 151 U. S. 452, 14 Sup. Ct. 379; Insurance Co. v. Smith, 31 C. C. A. 575, 88 Fed. 440.

Furthermore, it is the settled rule that the true meaning of a contract is to be obtained from a consideration of its entire provisions, and that a literal construction of a special clause will not be adopted, if such interpretation would result in making the contract meaningless in any material part, or would be manifestly opposed to the general purpose of the contract, considered as a whole. The fact so confidently relied on by counsel for complainant as a support to their view of the contract, that it was a general printed form, gotten up by the company for use in many widely-distant localities, seems to me to demand just the opposite conclusion to that advanced by counsel. The Arctic Company was engaged in manufacturing and erecting ice plants in many sections of the country. The company, of course, knew that in these different localities, of necessity, the coal used would vary greatly in heat-producing or evaporating power. In the use of a machine of this character, the amount of water that can be evaporated, under proper management, depends, not alone on the quality of the coal used, but also on the character of the boilers furnished, the draft created by the smokestack, and other like considerations; and therefore, when the company made its proposition to erect and put in successful operation at Lincoln, Neb., an ice plant capable of producing certain named results, the company must have known, and unquestionably did know, that the evaporating power of the plant would depend on the steam-producing capacity of the boilers which it proposed to furnish. As counsel admit in their argument, the company knew that the coal in common use in different localities varies greatly in its heat and consequent steam producing qualities, and it also knew that

boilers likewise vary in the same particulars, the variation being due to difference in size, in style, in the power of draft caused by the smokestack, and other like matters. Is it not clear, therefore, that when the company submitted its proposal to the defendant Cooper, to erect for him, at Lincoln, a 30-ton ice plant, with a guaranty that the plant would perform the work specified, it must be held that the company had ascertained all the conditions necessary to be taken into consideration in determining the working capacity of all the several parts of the plant which it was proposing to furnish? Is it not clear beyond question that the company sought to induce the defendant Cooper to enter into a contract for an ice plant to be erected by the company, by representing that it would erect at Lincoln an ice-making machine which would, under the conditions existing at Lincoln, Neb., produce 30 tons of ice for every 24 hours of continuous operation, with an expenditure of 4½ tons of good steam coal? To accomplish the result of producing 30 tons of ice, it is essential that the boilers shall evaporate a known quantity of water in the 24 hours, and the accomplishment of this result demands that the relation between the numbers, size, and style of boilers, with the draft and other matters affecting the steam-producing power thereof, and the fuel used therewith, shall be properly adjusted. The question of the quantity of coal needed to operate the plant was vital in determining the value of the plant, and the company clearly recognized its importance, in that it inserted in the printed form of specification used by it a guaranty in the following form.

"Coal Consumption: We guaranty the consumption of coal not to exceed ——— tons of good steam coal, when the machine and plant are properly operated, to produce the equivalent of ——— tons of ice manufactured every twenty-four hours of continuous operation, provided that the steam boilers evaporate eight pounds of water for every pound of coal burned."

It will be noticed that in the printed form there is a blank left for the number of tons of coal, which is evidently intended to be filled as the circumstances of each case may require. When the company submitted its proposition to Mr. Cooper, it filled this blank by writing in the words "four and a half," and thus it fully justified Mr. Cooper in assuming that the proposition was, in effect, that the plant would produce, if properly managed, 30 tons of ice for every 24 hours' continuous service, at an expenditure of 4½ tons of good steam coal. The plant proposed to be furnished included the boilers, smokestack, and other appurtenances. It was not expected that Cooper was to furnish the boilers, and it must be held, therefore, that the company assumed the duty of furnishing boilers of the proper capacity to meet the other requirements of the contract. It is true that this construction of the clause practically treats the concluding words as surplusage, but, if the construction urged by complainant is given thereto, it would nullify the entire clause; because, if there is no obligation resting on the company to furnish boilers which would enable the plant to produce the 30 tons of ice daily with an expenditure of 4½ tons of good steam coal, then the company could always evade liability by so constructing the plant that the boilers would not evaporate 8 pounds of water for every pound of coal burned; and the claim of complainant

is that the guaranty with respect to the quantity of coal to be consumed is conditional upon the evaporating power of the boilers, and becomes binding only when it appears that the boilers will in fact evaporate 8 pounds of water for a pound of coal burned. The contract, however, places the duty of furnishing the boilers upon the company, and not upon Cooper, and, if the entire plant will not meet the requirements of the contract because of the insufficient evaporating power of the boilers, the responsibility therefor is upon the company, and not upon Cooper.

But it is further claimed on behalf of complainant that it cannot be said that the guaranty with respect to the quantity of coal needed to produce the 30 tons of ice daily has been broken, simply because it requires more than $4\frac{1}{2}$ tons of such coal as Cooper uses in connection therewith to produce the 30 tons; it being urged in argument that, if coal of the steam-producing quality possessed by Pittsburg or Cumberland coal were used, the plant would produce the 30 tons of ice with an expenditure of not to exceed $4\frac{1}{2}$ tons, the amount named in the contract. The difficulty with this contention is that, in making the proposition to Cooper to furnish the ice plant, the company did not state that the proposition was based upon the use of coal from a given locality, such as Pittsburg or Cumberland. It must be borne in mind that the proposition came wholly from the company. If the purpose was to found the proposition on the use of coal from a known locality, certainly it would have been named in the proposition, and the fact that the specification and contract are silent on this matter clearly shows that the company did not intend to make it a condition of the contract that the coal used should be what is known as Ohio or Pittsburg or Cumberland coal. When the proposition was made to Cooper, the company certainly knew the kinds of coal that were in common use at Lincoln, Neb., for steam-producing purposes, and the fair and reasonable construction of the contract in this particular is that it was the understanding that the coal used would be that which was in common use at the locality where the company proposed to erect and put into successful operation the ice-making plant.

In the brief filed by counsel for the complainant, it is said: "When we made this guaranty it was immaterial to us what kind of coal Cooper used, because the amount of coal that it would take to make 30 tons of ice depended entirely upon the evaporative power of the coal used, and, if he used a coal that would not evaporate 8 to 1, then there was no guaranty on our part that $4\frac{1}{2}$ tons of coal would make 30 tons of ice." If this was the proposition which the company intended to make, it was certainly very unfortunate in the language used in the specification submitted to Cooper and upon which the contract is based. There is not a word said therein about the evaporative power of the coal to be used. Undoubtedly, it was understood that Cooper was to furnish the coal, and, if it had been the intent to require the use of coal from a given locality, the contract would have named the locality, or, if it had been the intent to require the use of a coal having a greater steam-producing power than that in common use at Lincoln, apt words to show such purpose would have been used in the contract, and the proviso would have read in some such form as follows: "Pro-

vided, that the coal used is equivalent in steam-producing quality to Pittsburg or to Cumberland Coal;" or it would have read: "Provided, that the coal used will evaporate eight pounds of water for every pound of coal burned." Instead of a proviso in some such form as the above, the one contained in the contract reads: "Provided, that the steam boiler evaporate eight pounds of water for every pound of coal burned." The first part of the clause defines the character of the coal to be used, to wit, "Good steam coal," and, reading this clause in connection with the entire contract, it must be held to mean that the duty was imposed upon Cooper to furnish and use in running the plant "good steam coal," and, this being done, then the company guarantied that, with proper management, the plant furnished, including the boiler, would produce 30 tons of ice every 24 hours of continuous running, and would consume in so doing $4\frac{1}{2}$ tons of coal.

But it is further argued on behalf of complainant that the coal used by Cooper was what is known as "Iowa Coal"; that this coal is far inferior in steam-producing quality to other coals, such as Illinois, Indiana, Ohio, Pennsylvania, and Maryland coal; and therefore it is not a good "steam coal," within the meaning of those words as used in the contract. But, as already said, the court cannot arbitrarily select out coal from any one or more of these localities, as the standard of a good steam coal, and assume that it was coal of that locality or of that quality that the company intended should be made use of in operating the plant. The evidence does not show that the words, "Good steam coal," have acquired a fixed or definite meaning in the trade, any further than that they may be used in distinction from the terms "mine run" or "slack." The evidence shows that, in miners' phraseology, the words "mine run" mean the coal just as it is produced from the mines, no separation having been made of the large lumps from the smaller lumps and particles, and "slack" means the screenings left after the lumps are removed, whereas "steam coal" includes coal freed from slack, and also from the larger lumps or blocks; and, in view of the evidence in this case, no further force can be given to these words than that it was the intention of the company to require the use of a grade of coal better than slack or mere screenings.

The evidence shows that the plant as furnished, if operated with good steam coal of the quality furnished by the mines in Iowa, Missouri, Kansas, or Nebraska, would not produce 30 tons of ice per day, if only $4\frac{1}{2}$ tons of coal per day were consumed; and the evidence further shows, that when this contract was entered into, the coal in common use at Lincoln, Neb., for steam-producing purposes, was the product of the mines in the named states, probably the greater part being Iowa coal. Construing the contract in the light of its surroundings, it must be held that the Arctic Company required of Cooper that, in the use of the ice plant to be furnished, he would use good steam coal (not slack or screenings) of the quality then in common use at Lincoln, Neb., for steam-producing purposes, and, based upon that requirement, it contracted to furnish an ice plant according to the specification submitted, and guarantied that, when erected, it would, if properly managed, produce 30 tons of ice per day, with a consumption of $4\frac{1}{2}$ tons of coal per day. If this is the proper construction

of the contract, it follows that the guaranty therein contained has not been performed or kept good; for the evidence clearly shows that the plant erected by the company will not produce 30 tons of ice per day with a coal consumption of 4½ tons of good steam coal of the grade in general use at Lincoln.

The only relief asked in the answer is that the court will ascertain the amount of damages to which the defendant Cooper may be entitled by reason of the breach of the guaranty, and to set off the same against any amount found due the complainant. There is no evidence introduced on which the court can base a finding as to the difference in value, if any, of the plant as a whole, as it was furnished, and its value had it met the requirements of the guaranty, and, under the evidence, the court is limited to the damages proved to have accrued, up to the present time, to the defendant Cooper, by reason of the greater consumption of coal necessary to produce 30 tons of ice during each 24 hours of continuous running. Giving consideration to all the facts bearing upon this point, an allowance of $2,500 is probably a fair estimate of the increased consumption of coal due to the failure of the plant to meet the requirements of the guaranty, and this sum, with interest at 6 per cent. from July 1, 1897, will therefore be allowed the defendant, by way of set-off, against the sum due on the two notes which have already matured. The clerk will compute the amount due upon the notes declared on, deducting therefrom the damages allowed, and a decree of foreclosure will be entered as prayed for, each party to pay his own costs.