BIJUR MOTOR LIGHTING CO. v. ECLIPSE MACH. CO. et al.

(District Court, W. D. New York. July 14, 1916.)

No. 136B.

**1. CONTRACTS ☞155—CONSTRUCTION—GENERAL RULES.**

A written agreement, drawn after protracted negotiations initiated by one of the parties, under whose supervision the instrument was also drawn, is to be strictly construed, and any doubt as to its true meaning and construction is to be resolved against such party.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 736; Dec. Dig. ☞155.]

**2. CORPORATIONS ☞406(2)—PRESIDENT—AUTHORITY TO MAKE CONTRACTS.**

Where a part of the business for which a corporation was organized was "to acquire, sell, and deal in patents and patent rights upon inventions," yet in fact it dealt in a large number of patents, in which transactions it was represented by its president, who was also its general manager, he must be presumed, in favor of a third person dealing with the corporation, to have had authority to execute a contract granting a license under one of its patents.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1612; Dec. Dig. ☞406(2).]

**3. PATENTS ☞209(1)—CONTRACT TO GRANT LICENSE—VALIDITY.**

A written agreemeut, executed on behalf of complainant corporation, by which it contracted to grant a license to defendants under a patent, *held* valid and binding, and to entitle defendants to a specific performance.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 300; Dec. Dig. ☞209(1).]

In Equity. Suit by the Bijur Motor Lighting Company against the Eclipse Machine Company and Vincent Bendix. Decree for defendants.

Engelhard & Pollak and Emery, Booth, Janney & Varney, all of New York City (Walter H. Pollak, Frederick L. Emery, and Samuel L. Jackson, all of New York City, of counsel), for plaintiff.

Rector, Hibben, Davis & Macauley, of Chicago, Ill., and Stanchfield, Lovell, Falck & Sayles, of Elmira, N. Y. (John B. Stanchfield, of New York City, Samuel E. Hibben, of Chicago, Ill., and Alexander D. Falck, of Elmira, N. Y., of counsel), for defendants.

HAZEL, District Judge. This is a bill in equity to enjoin the defendants from infringing patent No. 1,095,696, granted May 5, 1914, to Joseph Bijur, inventor, for improvements in engine starting apparatus, consisting of specific means for transmitting power from the starting motor to the flywheel of the engine. Defendants attack the validity of the patent, but mainly rely upon a written agreement or contract, dated July 9, 1914, to grant a license under the invention to Vincent Bendix, and pray for specific performance thereof. The defendants' asserted legal right to a license under the agreement or writing is sharply controverted by the complainant company, and the maintenance

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of this action for infringement is dependent upon the intendment of the parties at the time of the execution and delivery of the document. The replication substantially avers that an agreement was never executed or delivered, and that complainant was induced to sign the writing by fraudulent representations made by the defendant Bendix; but at the trial the latter averment was disclaimed or abandoned, and testimony directed towards proving that no completed or binding agreement to license had been made.

Concededly no fraud or deception was practiced by Bendix or the witness Dunn, who represented the Eclipse Machine Company, sublicensee, at the time the writing was executed, to induce Bijur, president of the complainant company, or Allen, an employé, to sign the agreement. The latter were not ignorant persons, or persons unacquainted with business methods or contractual obligations. By education and experience they were familiar with the effects of the consummation of contracts, and accordingly must abide by the consequences of their acts. They initiated the meeting with Bendix and Dunn at the office of Blair, their solicitor, where the plan of co-operation and association with Bendix in the exploitation of the patent in suit and the probable effects thereof were discussed in detail and at length.

The agreement, although terse and inelaborate, nevertheless admittedly is without ambiguity or indefinitiveness, and is believed to fairly express the intention of the parties. Each subdivision of the document was protractedly discussed before and after reducing it to writing, and no doubt was fully comprehended by the participants in the transaction. If anything was left unincorporated which should have been included, there is nothing in the document to indicate the fact. Its very silence on the subject is to my mind indicative of the fact that matters not expressly referred to were regarded as matters of detail, and not of the essence of the agreement. If in truth the effectiveness of the agreement was intended to be dependent upon future conditions, a reading of the agreement does not disclose such intention, although it appears that Bendix was to furnish at some future time the wording of the broadest claim of the German application, warrant its allowance, give information regarding the filing date, and, further, to secure a certain United States application for patent which was alleged to interfere with the Bijur patent in suit. The instrument in question reads as follows:

"Memorandum of Agreement Reached July 9, 1914, Between Bijur Motor Lighting Company and Vincent Bendix.

"First. Mr. Bendix is to receive a license under the Bijur patent, No. 1,095,696, for the life of the patent, and for the manufacture, use, and sale of starters involving a screw shaft.

"Second. This license is to be exclusive as against all parties save Bijur Motor Lighting Company.

"Third. This agreement is to be binding upon the heirs and successors of both parties, and upon the assignees of the whole business of each party, and is to convey to Mr. Bendix the right to sublicense the Eclipse Machine Company, its heirs, successors, and assigns of its business.

"Fourth. Mr. Bendix is to pay a royalty of five hundred dollars ($500) a year.

"Fifth. Mr. Bendix is to grant the Bijur Motor Lighting Company an exclusive license under each of his foreign patents or applications on starting apparatus for the life of the prospective foreign patents or applications.

"Sixth. The foreign rights given under the Bendix foreign patents are in no way to interfere with the rights of export and use in foreign countries of all apparatus built in accordance with the license to Mr. Bendix under the Bijur patent in this country.

"Seventh. The rights of Mr. Bendix under this agreement and those of his licensee shall extend to the manufacture in Canada, as well as its use and sale.

"Eighth. Mr. Bendix agrees, without further consideration, either to secure a certain United States application now pending in the Patent Office, and alleged to interfere with the Bijur patent, and guarantee that it be conducted and handled throughout in a manner satisfactory to the Bijur Motor Lighting Company, or, failing in this, that he will, at his own expense, vigorously prosecute the parties owning or controlling such application, or the resultant patent, to his full ability, under any rights which he may possess.

"Ninth. Mr. Bendix and the Eclipse Machine Company agree to mark the goods licensed under this agreement, 'Licensed under Patent No. 1,095,696,' or equivalent words.

"Tenth. As against infringers of the Bijur patent, building screw shaft starting apparatus, Mr. Bendix is to bear the expense of legal proceedings, and as against other infringers of said patent Bijur Motor Lighting Company is to bear the expense of legal proceedings.

"Eleventh. Mr. Bendix is to furnish the wording of the broadest claim which has been allowed to his German application, and warrant that it has been allowed, and also the effective filing date of the German case.

"Twelfth. Mr. Bendix agrees that the licensee [the Eclipse Machine Company] will, in consideration of the granting of this license by the Bijur Motor Lighting Company, give an additional discount of five per cent. (5%) off from the best price named to any other motor and lighting company, and that he will also obtain the best deliveries and prompt service.

"In witness whereof, we have hereunto set our hand and affixed our seals this 9th day of July, 1914, the Bijur Motor Lighting Company by its proper officer thereunto duly authorized.      Bijur Motor Lighting Company.
                                    "By Walter C. Allen. [L. S.]
                          "Vincent Bendix. [L. S.]"

As complainant asserts that this agreement was informal, preliminary, and incomplete, and not a binding and enforceable obligation, it is necessary to summarize the facts and circumstances in chronological order: In the year 1912, before the agreement in question was suggested, Bendix invented a transmission drive for gas engines, and filed an application for a patent. Associated with one Brandenburg, he immediately exploited the same, and entered into a license and manufacturing agreement with the Eclipse Machine Company, of Elmira, N. Y., for the manufacture of starters upon payment of royalty. Prior thereto, on March 12, 1912, the complainant's application for a patent for starters for engines was filed, and on May 5, 1914, was inadvertently granted, as shown by the file wrapper and contents in evidence, in view of the fact that Bendix was entitled to an interference therewith under rule 96 of the Patent Office to determine any question of priority of invention. Thereupon Bendix, as he testified, because of the expense entailed by interference proceedings, recurred to the offer previously made by complainant to give him a license under the Bijur patent.

On May 30, 1914, Bendix met the witness Allen, complainant's employé, and requested a conference on the license project which was

later had with Mr. Bijur, Mr. Allen, and Mr. Blair, patent solicitor for complainant, on June 13, 1914, at the office of the latter. The grant of a license, under the Bijur patent, the Bendix application for a patent, and right of interference within the time specified by the Patent Office, and which had not then expired, and the foreign applications for patents filed by Bendix, were discussed, but without the parties reaching any agreement. It is shown that Bendix afterwards mailed copies of the drawings upon which his foreign applications were based to complainant's solicitor, and on July 8, 1914, there was another conference between Bijur, Allen, and Blair, on one side, and Bendix and the witness Dunn, on the other. The giving of a license under the Bijur patent was again discussed in all its details, with regard to the length of the license, the right of Bendix to sublicense to the Eclipse Machine Company, the royalties, the license from Bendix to Bijur of foreign patents, the applications, the manner of marking the manufactured articles by the sublicensee of Bendix, the Eclipse Machine Company, the control of other applications alleged to interfere with the Bijur patent, etc., and on the following day another conference, lasting several hours, was held at Blair's office, resulting in the dictation of the agreement in question and its typewritten transcription. The evidence discloses that Blair, Bijur, and Dunn dictated portions of the agreement, and that each paragraph was read aloud by the stenographer before it was transcribed, as was also the agreement in its completed form. While the dictated agreement was being typewritten, Bijur and Dunn, who had other engagements, left the office; Bijur, before leaving, having requested Allen to remain and sign the document on behalf of the Bijur Motor Lighting Company. There is dispute as to what was said about signing the document; both Bijur and Allen claiming that Bijur requested Allen to initial the agreement in its completed form. When the agreement was written out, Blair examined it, removing the certificate of acknowledgment, which he regarded as immaterial, and handed the same to Allen. It was then reread and signed as hereinbefore indicated.

[1] It is conceded by both sides that the concluding clause, "In witness whereof," etc., was not dictated, but was added by the stenographer who took the same from some contract form. It is claimed that the original omission of the concluding clause supports the view that the agreement was recognized by both parties as being informal and preliminary; but this is negatived by the fact that neither the appearance of the undictated clause in the transcribed agreement nor the formal way in which the name of complainant company appears as a signatory by Allen, with the letters "L. S." at the end, elicited any comment at the time the document was signed, which tends to indicate that they met with approval. The formal opening words, "Memorandum of Agreement Reached July 9, 1914, Between the Bijur Motor Lighting Company and Victor Bendix," and the protracted meetings and negotiations before an understanding was reached, make applicable the general rule of strict construction, which requires resolving any doubt as to the true meaning and construction of any of the provisions against the complainant, at whose instigation the parties met

for the purpose of reaching an agreement, and by whom or under whose supervision it was prepared or drawn. Wilson v. Cooper et al. (C. C.) 95 Fed. 625; Van Zandt v. Hanover Nat. Bank, 149 Fed. 127, 79 C. C. A. 23; Christian v. First Nat. Bank of Deadwood, S. D., 155 Fed. 705, 84 C. C. A. 53. Under the circumstances the fact that the concluding clause was not dictated, but was added by the stenographer, does not warrant the inference that the writing constituted an incomplete agreement, or merely a memorandum of what was to be later embodied in a formal agreement. The writing contains all the elements of a valid contract, regardless of the concluding clause. Nor were the instructions by the president of complainant to Allen to initial the document as distinguished from signing it, of material importance (Bean v. Clark [C. C.] 30 Fed. 225); none of the salient provisions having been changed after his departure.

[2] A question, however, arises as to Bijur's authority to execute the agreement without the express sanction of the board of directors. It is true the defendants are required to prove the authority of the president to make license agreements; but the burden has, I think, been fairly met. The many authorities cited in complainant's brief in support of the contention that a president of a corporation upon general principles has no legal right to sell or convey the property of the corporation, or bind it by his contract to do so, without the concurrence of the board of directors, no doubt correctly states the law; but such authorities are here inapposite. It cannot be presumed that Bijur was without authority, as the business of the complainant, among other things, was to do the very thing which he did, namely, "to acquire, sell, and deal in patents and patent rights upon inventions." The case of Kansas City Hay Press Co. v. Devol et al. (C. C.) 72 Fed. 717, urged as a controlling precedent, can easily be distinguished. There the patent was assigned by the president and secretary, without any authorization of the board of directors, to pay a personal debt of the president, the patent being the only asset possessed by the corporation; moreover, there is no proof that consideration passed to the company, and the general management of its affairs, under the by-laws, was in the president and board of directors.

In De La Vergne Refrigerating Mach. Co. v. German Savings Institution, 175 U. S. 40, 20 Sup. Ct. 20, 44 L. Ed. 65, the president, without authority from the board of directors, entered into a contract with another to acquire all its assets and stock, which at the time were in the hands of a receiver for the benefit of creditors, and the Supreme Court held that under such circumstances no consideration could pass to the buying company, and as the laws of the state where the buying company was incorporated prohibited such company from using any of its funds to buy stock in any corporation, the transaction was ultra vires. Without going into the other cases cited on this point by the complainant, I conceive it to be the law that officers or agents of a corporation, who are permitted to hold themselves out as authorized to act, bind the corporation by their silence when there is a duty upon them to speak. In United States Bank v. Dandridge, 12 Wheat. 63, 6 L. Ed. 552, the Supreme Court said:

"If officers of the corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. * * * In short, we think that the acts of artificial persons afford the same presumptions as the acts of natural persons. Each affords presumptions, from acts done, of what must have preceded them, as matters of right or matters of duty."

The general principle of law applicable to the powers and duties of executive officers of corporations is not believed entirely inapt under the facts herein disclosed, and by analogy the case of Standard Fashion Co. v. Siegel-Cooper Co., 44 App. Div. 121, 60 N. Y. Supp. 739, is of value. There the contract was signed by the general manager, who acted for the president of the company during the latter's absence from the room, with knowledge that a completed contract for space in the company's department store was with his approval about to be signed and delivered. His authority and that of the general manager, the signer, to make the contract was questioned, on the ground that the by-laws of the company did not give them such authority; but the court said:

"It is idle to appeal to the by-laws of such a corporation as affecting contracts made with third persons in reliance upon the apparent authority of its executive agents."

And quoted from Rathbun v. Snow, 123 N. Y. 349, 25 N. E. 379, 10 L. R. A. 355:

"By-laws of business corporations are as to third persons private regulations, binding as between * * * its members or third persons having knowledge of them, but of no force as limitations per se as to third persons of an authority which, except for the by-law, would be construed as within the apparent scope of the agency."

The court considered that letting space in the department store was as much a part of the business of the corporation as buying and selling other commodities in which the company dealt. In the present case, as heretofore stated, a part of the business of the complainant company was the actual dealing in patent rights, and it is shown to have been the owner of upwards of 100 patents covering various articles of manufacture in which it dealt, and accordingly the making of license agreements was, I think, within the scope of its ordinary business, especially as there is evidence in the record of other transactions relating to the issuance of patent licenses by Bijur and ratification of his acts by the board of directors at a later date. See Scofield et al. v. Parlin & Orendorff Co., 61 Fed. 804, 10 C. C. A. 83; 10 Cyc. 903; 10 Cyc. 941; Cook on Corporations, § 725; Jenson v. Toltec Ranch Co., 174 Fed. 86, 98 C. C. A. 60.

Nor is the contention convincing that a different rule applies in the federal courts than in the courts of New York state with regard to by-laws and corporate agency. In San Antonio v. Mehaffy, 96 U. S. 312, 24 L. Ed. 816, the Supreme Court, citing Whitney Arms Co. v. Barlow et al., 63 N. Y. 62, 20 Am. Rep. 504, says:

"The doctrine of ultra vires, whether invoked for or against a corporation, is not favored in the law. It should never be applied where it will defeat the ends of justice, if such a result can be avoided."

In Patterson v. Robinson, 116 N. Y. 193, 22 N. E. 372, it is said:

"Where a contract, made in the name of a corporation by its president, is one the corporation has power to authorize its president to make, or to ratify after it has been made, the burden is upon the corporation of showing that it was not authorized or ratified."

Nor is St. Vincent College v. Hallet, 201 Fed. 471, 119 C. C. A. 647, an authority on this point, as a careful reading of the case will clearly show, for there, it is enough to state, the learned court pointed out the distinction between the principles of corporation law applicable to charitable corporations and to trade corporations.

Bijur was not only the president, but also the general manager, of the complainant company, and had full power and authority over its business affairs. He was in active charge, controlled its policy, owned a large block of the capital stock, and with one exception the directors were relatives of his. Meetings of the board of directors were few, and in fact none was held until more than a year after the contract in controversy was made. From this it may be inferred that the company practically invested its president with the powers of the board of directors in relation to licensing patents, and it was therefore bound by his acts in the same way as though such acts had been specifically authorized by the board. He had the power to delegate to Allen, an employé of the company, the doing of a ministerial act which he himself was empowered or authorized to do. Standard Fashion Co. v. Siegel-Cooper Co., supra. It was the act of an amanuensis in obedience to instructions given him. Commercial Bank of Lake Erie v. Norton & Fox, 1 Hill (N. Y.) 501.

[3] It is further contended that the Eclipse Company was necessary as a party to the agreement, and that, as it did not sign the same, the complainant was released; but as such company had previously been licensed by Bendix to manufacture starters under his invention and other starting device inventions acquired by him, of which complainant had notice, it was not astonishing that the agreement for the greater part was phrased to indicate an agreement between Bendix and the complainant only. Dunn testified that he did not expect to become a party to the instrument, save in the way of becoming a beneficiary through Bendix's acquirement, and none of the provisions of the agreement, except perhaps the ninth, which is qualified and explained by the twelfth, suggests the necessity of the Eclipse Company's becoming a party to the agreement, and thus the premises upon which the argument is predicated, that the instrument cannot as a matter of law bind either of the signers because of nonexecution by the Eclipse Machine Company, fail. Whitaker v. Richards, 134 Pa. 191, 19 Atl. 501, 7 L. R. A. 749, 19 Am. St. Rep. 684; Cutter v. Whittemore, 10 Mass. 442; Dillon v. Anderson, 43 N. Y. 231.

It is further submitted that Bendix and Dunn practically concede, in a letter written to Blair a short time after the instrument was

signed, that it was incomplete and merely a memorandum of a formal agreement to be entered into in the future. The letter is as follows:

"The Waldorf-Astoria,                                      New York, 7/9, 1914.

"Dear Mr. Blair: I will be in Chicago Saturday morning, and will have Mr. Hibben write up a complete and final agreement per your memorandum, and send it to you along with the foreign data for your approval. * * *

"Very truly yours,                                      V. Bendix."

Contemporaneously therewith he telegraphed Brandenburg, his associate, as follows:

"New York City,                                      July 9, 1914.

"G. G. Brandenburg, c/o Brandenburg & Company, 1112 South Michigan Avenue, Chicago, Illinois.

"Have signed papers completing very satisfactory arrangements with Bijur, who has also signed exclusive license to us. * * *    V. Bendix."

On comparison there will be observed an apparent inconsistency in these communications, but in the light of the evidence they are in accord with defendant's claim that, after making the agreement, the understanding was that a formal written license under the Bijur patent and a formal license under the Bendix foreign application, including the warranty that a certain claim had been allowed in a German patent, should be prepared independently of the agreement.

It was in terms agreed that Bendix should furnish the wording of the broadest claim that had been allowed to his German application, and it was testified by complainant's witnesses (see Blair letter, Plaintiff's Exhibit 12, in answer to a letter from Bendix's solicitors, conveying information as to filing date, and including drawings of the German application, also bearing upon this claim) that the German application was regarded an important feature in the negotiations preceding the contract, and that the supposed allowance of the claim having a scope as broad as the Bijur patent "was in his [Bijur's] mind to form a leading compensation for a license to Mr. Bendix"; but in my opinion paragraph 11 does not make the operativeness of the contract dependent upon a condition precedent, and to read such a condition into it would do violence to the principle that all prior negotiations, understandings, and intentions were merged in the written agreement, and, accordingly, the agreement cannot be varied, contradicted, or modified to comport with what is now claimed to have been a primal reason for entering into the contract.

There was discussion as to whether the Bendix claims embodying the screw shaft device would dominate the Rushmore device in Germany; but the testimony of Blair relating thereto was not so clear and definite as to convey the impression that it was desired to dominate it, in the sense that it would be held an infringement, and that unless this resulted an agreement would not have been entered into. Allen on this point testified substantially that Bendix, in the presence of Dunn, said that he had applied in Germany for a patent covering his method of connecting up the motor with the gasoline motor, and that as he knew that the Rushmore company had most of the business over in Europe, and as he understood that we were trying to break in, he held out that his "patent would be very valuable over there," that "it domi-

nated the Rushmore patent," and that they "could put Rushmore out of business." But Bendix and Dunn denied such statements, and testified to a radically different version—i. e., that the conversation simply suggested that the Bendix German application would operate to secure protection in Germany of a device competing with the Rushmore device, that the broadest German claim was to be furnished, but that nothing was said about leaving the matter open, as testified by Blair, until he (Blair) had a chance to give an opinion as to the scope of the Bendix claim. As the Bijur device in suit was not patented in Germany, it is not improbable that the acquirement of the Bendix application would have been desirable, and would have given substantial protection to the starting device manufactured under the Bijur patent. The drawings of the Bendix device, which were submitted to Blair, indicated a relative movement between the pinion and the shaft, and, if the dominancy of the Rushmore device then marketed in Germany had been the principal reason for making the contract, Blair, it is reasonable to suppose, would not have omitted a statement to that effect. Besides, there was nothing in the agreement to indicate an intention to assign the legal title to the Bendix application, so that action might be brought against the Rushmore company for infringement in Germany, and presumably such a provision would have been embodied therein, regardless of what the law in Germany might have been as to the right of an exclusive licensee to prosecute for infringement, if it had been intended that the license should supersede the Rushmore construction.

The claim considered by defendants as the broad claim was submitted to complainant July 14, 1914, and on September 28th of the same year a somewhat differently phrased claim was submitted; but in explanation it was testified that the earlier submission included original claim 1, revised claim 1, and claims 2 and 3, which had not been objected to by the examiner, and which were therefore deemed allowed. The broadest of the claims submitted, according to complainant, was limited to the relative movement between the motor and the driving pinion, while the pinion in the Rushmore structure was made to move by the motor armature, but was claimed to have no relative movement with respect thereto. It is unnecessary, and indeed it is impossible upon this record, to determine whether the broadest claim submitted by Bendix was broad enough to cover the Rushmore starter.

It is finally contended, assuming the contract to have been valid, that defendants failed to perform thereunder, as they did not vigorously prosecute the Remy application, but allowed the Bendix rights to go by default; but this contention is, I am satisfied, without merit. The agreement by Bendix to furnish information as to the Remy application and to prosecute the interference at his own expense were not conditions precedent to the making of the license contract; the provision being open to the construction merely that it was the intention of the parties to remove all question of interference by a third party, and the information imparted by Bendix at the time of making the contract being true, as the subsequent declaration of interference between the Remy company and the Bijur application showed. In acquiring the Remy application, it must be admitted, Bendix certainly eliminated

237 F.—7

objections raised against the grant of the patent to Bijur, a grant declared by the Patent Office to have been inadvertent.

There were other provisions, as complainant contends, which might well have been referred to in the memorandum agreement, such as the date of the license, time of payment of royalty, etc.; but their omission does not invalidate the agreement, as it has frequently been held that, where no time is fixed for the performance of the contract, the law implies a reasonable time for performance. Gill Mfg. Co. v. Hurd (C. C.) 18 Fed. 673. The evidence in its entirety shows that defendants have reasonably performed the obligations required of them under the agreement by tendering to the complainant the royalty specified, together with a license from Bendix to the Bijur company under his foreign patents and applications, and by afterwards tendering the Remy application, and by performing the acts required of them.

My conclusion, therefore, is that the defendants do not infringe the Bijur patent in suit, and a decree, including specific performance as affirmatively prayed, may accordingly be entered, with costs.